William David FLOYD, Plaintiff-Appellee Cross-Appellant,

v.

Kelly S. SEGARS, Defendant-Appellant Cross-Appellee.

Kelly S. SEGARS et al., Plaintiffs-Appellants Cross-Appellees,

v.

William David FLOYD et al., Defendants-Appellees Cross-appellants.

No. 76–2910.

United States Court of Appeals, Fifth Circuit.

May 8, 1978.

Douglas C. Wynn, Greenville, Miss., Fred M. Bush, Jr., Tupelo, Miss., for defendant-appellant cross-appellee.

James E. Price, Corinth, Miss., for Wm. Floyd.

Before TUTTLE, MORGAN, and CLARK, Circuit Judges.

CHARLES CLARK, Circuit Judge:

This appeal, arising under our diversity jurisdiction, grows out of a suit and counter suit for breach of contract, governed by Mississippi law. The plaintiff and cross-appellant, William David Floyd, entered into a series of agreements with the appellants and cross-appellees, Dr. Kelly S. Segars, Horizon Broadcasting, Inc., and Horizon Radio, Inc., for the operation of radio stations in Iuka and Cleveland, Mississippi. Following trial to the court, the district court found that Segars breached his written contract with Floyd. The district judge denied each party damages, but ordered specific performance by Segars of a written contract to transfer to Floyd 25% of the shares of Horizon Broadcasting, in addition to 20% that Floyd already held. On appeal, Segars challenges the district court's finding that he breached his written contract with Floyd. Both Floyd and Segars contend that the district court erred in ordering specific performance and in failing to award damages for other alleged injuries. Finding no error, we affirm the judgment of the district court.

Floyd had considerable expertise in the operation of radio stations; Segars had money. In 1969, Floyd and Segars began negotiations to purchase radio station WVOM in Iuka, Mississippi, from E. C. Holtsford. Holtsford agreed to finance $48,750 of the $70,000 purchase price, with the balance to be paid in cash. Arrangements were made to borrow the down payment from First American National Bank in Nashville, Tennessee (First American). Segars and Floyd entered into a written contract under which Segars, if successful in purchasing WVOM, would transfer the assets to a corporation, Horizon Broadcast-ing. This corporation would issue 80% of its stock to Segars and 20% to Floyd and would assume the indebtedness created by the purchase of WVOM. Segars and Floyd agreed to pledge all of the Horizon Broadcasting stock to First American until repayment of the down payment loan. Segars agreed to assign an additional 25% of the total authorized stock of Horizon Broadcasting to Floyd when the total initial purchase price of the radio station was repaid from radio station profits, so that Segars would own 55% of the total authorized stock and Floyd would own 45%. The contract also provided that if either party desired to sell his stock, the other party would have an opportunity to purchase the shares at an agreed upon price or at a price set by two qualified appraisers, one selected by each party. Floyd agreed to be manager of the radio station and to "conduct the business of said radio station in a business-like manner and . . . give sufficient of his time to the operation of the same to insure said manner of operation."

Following approval of the purchase by the Federal Communications Commission (FCC), Segars alone executed a note to Holtsford, and both Segars and Floyd executed a note in the amount of $22,500 to First American. The stock of the corporation and additional stock in First American pledged by Segars secured the loan from First American. Soon thereafter, Segars and Floyd incorporated and organized Horizon Broadcasting. Segars conveyed his interest in WVOM to Horizon Broadcasting, along with his interest in an FM Construction Permit for a second station in Iuka.

Horizon Broadcasting employed Floyd from February 1970 until June 29, 1974. Segars, as president of Horizon Broadcasting, negotiated Floyd's salary with him from time to time during this period. The parties never made a written contract for Floyd's employment. Floyd and Segars also joined forces to set up a short-lived recording operation and an entertainment complex known as Funland, which operated a drive-in theater in Belmont, Mississippi, and a skating rink and golf course in Iuka.

In 1972, without an amendment in writing of their original contract, Segars and Floyd began negotiations for the purchase of twin AM/FM radio stations in Cleveland, Mississippi, WDSK and WDLT. Horizon Broadcasting made the purchase through a newly created subsidiary, Horizon Radio, Inc. First American loaned the $26,000 down payment on the $135,000 purchase price. Both Segars and Floyd signed the loan agreement, secured primarily by Segars' Iuka Bank stock. Horizon Radio signed a note to the seller of the Cleveland stations, Tony Conguista, for the $109,000 balance.

Around January 1974, Floyd, acting independently of Segars and Horizon Broadcasting, investigated the acquisition for himself of radio station KSEY in Seymour, Texas. In his application to the FCC, Floyd stated that he would serve as "President and General Manager (Full-time)" and that his wife would serve as "Assistant Station Manager (Full-time)" of KSEY. Segars learned of Floyd's involvement with the Texas station and confronted him with it. Following a conversation the contents of which are in dispute, Segars discharged Floyd.

Segars contends that when quizzed about the Texas operation, Floyd made extortionate demands and threatened to move to Texas if those demands were not met, thus committing an anticipatory breach of his written contract. The district court found that "the underlying concern of Dr. Segars was that since he was to be excluded from the Texas radio venture and Floyd was 'holding out on him,' so to speak, he, Segars, decided to act without further ado, and that he did." The district court also found that, despite what Floyd later stated in the FCC application, he was on the job managing the Iuka and Cleveland stations at the time Segars discharged him. Additionally, the district court found that "Dr. Segars was also motivated by a feeling that any activity by Floyd unrelated to or disassociated from the Iuka and Cleveland, Mississippi, radio stations was harmful to his—Dr. Segars'—financial interest and jeopardized his potential liability, which was considerable." Because prior to Floyd's discharge the management of both the Iuka and Cleveland stations was progressing in an orderly manner, operations had been sound, equities had been accumulating on behalf of both owners, and Floyd, like Segars, had been "on the hook personally," the district court concluded that Segars acted without a factual basis for cause in terminating the contract and thus exposed himself to liability.

Floyd filed suit for the dollar value of 45% of the shares of Horizon Broadcasting and money damages to compensate him for the loss of the opportunity to manage the radio stations and to receive a salary. Segars, Horizon Broadcasting, and Horizon Radio cross-claimed, alleging that Floyd committed an anticipatory breach of contract by entering into arrangements for the purchase of the Seymour, Texas, radio station. Also, Segars sought return of the 20% of Horizon Broadcasting stock initially issued to Floyd under the written contract. Horizon Broadcasting and Horizon Radio sought damages for Floyd's alleged defalcations as manager.

Following a trial to the court, the district court denied damages to each party but ordered specific performance of the contract by the transfer of 25% of the stock in Horizon Broadcasting to Floyd as soon as the purchase prices were repaid from profits. The court fixed July 1, 1984, as the outside date by which such performance was to be rendered based on Segars' testimony and the operating experience of the stations to date. The district court awarded no damages for what Segars alleged was Floyd's "chiseling" of the corporation. From this judgment, the parties now appeal.

The district court correctly found that two contracts were involved in the transactions here. The first was a written, orally amended contract for the purchase of WVOM in Iuka and the two additional radio stations in Cleveland later acquired through Horizon Radio, a subsidiary of Horizon Broadcasting. Under this contract, Floyd received 20% of Horizon Broadcasting stock immediately and a promise that an

additional 25% of the stock would be transferred to him at a later date. In return, Floyd agreed to forego other business opportunities and entered the second contract, an entirely oral contract, with Horizon Broadcasting for employment as manager of the various Horizon Broadcasting stations.

The district court found that Dr. Segars acted precipitately, "without giving Floyd any opportunity whatever to show that he could adequately look after the Mississippi radio interest." Segars challenges this finding as clearly erroneous because Floyd after the discharge submitted an affidavit to the FCC in connection with his application for the Seymour, Texas, radio station which stated that he had always intended to serve as its full-time manager. Floyd filed the affidavit in response to Segars' submission to the FCC of a petition to deny Floyd's application for transfer of ownership of the Seymour, Texas, radio station. Obviously, this affidavit tends to discredit Floyd's testimony that he planned to continue managing the Horizon stations despite his purchase of the Texas station. The district court expressly took into account this inconsistent statement made under oath but found that it did not necessarily destroy Floyd's credibility "when the great weight of substantial evidence and acts of the parties directly point to the opposite conclusion." Segars asserts that the district court judge was "mesmerized by Floyd and believed Floyd's unsupported testimony, disregarding the overwhelming weight of the evidence to find for Floyd."

■ Floyd's inconsistent statement under oath is a very serious matter which deserved and received careful weighing by the district court. However, the resolution of conflicting evidence remains the province of the district court. Where the record supports the district court's conclusion, it would be improper for a reviewing court to overturn that decision either because the factors could have been weighed differently or because an opposing party represents that witness demeanor does not support the choice made. Therefore, we hold that the district court did not clearly err in finding that Segars, not Floyd, breached the written contract.

From different approaches, both Floyd and Segars assert that the district court erred in ordering that Segars convey to Floyd 25% of the shares of Horizon Broadcasting in addition to the 20% he already held. First we consider Floyd's challenge. He contends that the district court should not have ordered specific performance because he had an adequate remedy at law through damages and because Mississippi law does not favor specific performance. Floyd alleges that the remedy of specific performance in this case is inferior to damages because it will leave him, a minority shareholder, at the mercy of an angry controlling shareholder, Segars.

The district court held that awarding damages would have been contrary to the contractual provisions and contrary to principles of justice. We agree. Money damages based upon the present value of future interests would be entirely speculative. Money damages based upon future values would place Floyd in a better position than he would have occupied if the contract had not been breached. The contract provided that his maximum return could only be realized after his investment of time had produced profits which repaid the purchase price debt. When he entered the contract, Floyd must have been aware of Dr. Segars' power as majority shareholder to affect the value of Horizon Broadcasting stock, thus this risk was inherent in the original transaction. Moreover, just as when Floyd initially entered the deal, the court's judgment leaves Floyd's interest in the corporation protected by Segars' own self-interest because their fortunes in Horizon Broadcasting rise or fall together.

■ Specific performance also was appropriate here because of the nature of the property involved. Specific performance frequently is the most suitable remedy for breach of a contract for transfer of stock where the stock has no market value, its value is not fixed and cannot be readily ascertained, the stock cannot be readily

obtained otherwise, or there is a particular reason why the remedy should be granted. *See Nanfito v. Tekseed Hybrid Co.*, 341 F.Supp. 240 (D.Neb.1972), *aff'd* 473 F.2d 537 (8th Cir. 1973); *McCutcheon v. National Acceptance Corp.*, 143 Fla. 663, 197 So. 475 (1940); *General Securities Corp. v. Welton*, 223 Ala. 299, 135 So. 329 (1931). In this situation, liquidated damages could not have accurately taken into account both the uncertain value of the shares and the future risks which each party undertook as part of the bargain. For all of these reasons, we refuse to fault the district court's grant of specific performance in lieu of damage relief.

Segars contends that even if the district court correctly found that he, not Floyd, breached the contract, Floyd should receive at most a part of the 45% of Horizon Broadcasting shares provided for in the contract, which would credit the time worked to discharge against the entire station pay out period. Because court was able to set a date certain for the transfer of the contested shares from Segars to Floyd, Segars contends the court had a basis for prorating the shares that eventually were to go to Floyd under the contract. The district court considered this argument but rejected it for two reasons: first, because Segars acted wrongfully and without cause in terminating the written agreement; and, second, because the contract as written provided no basis for allocating the shares according to the length of time that Floyd remained as station manager.

■ We find no error in the district court's refusal to prorate the shares owed to Floyd. As authority for prorating, Segars cites cases dealing with employment bonus contracts. The written contract between Segars and Floyd does not fit that mold, however. Floyd was not promised additional compensation for the superior performance of something he was already obligated to do. The written contract contained no terms and conditions of employment. Rather, this contract was an inducement to Floyd to forego other business opportunities and to move to Iuka so as to make himself available to enter a separate contract for employment as manager of the Horizon Broadcasting operation. The contractual inducement for Floyd to come to Iuka was the promise that he would eventually own 45% of the shares of Horizon Broadcasting. The additional 25% of the shares was not a bonus but part of the original consideration, and the fact that the contract provided an incentive to increase station performance by setting the date for the stock transfer as the date the station paid out from their own profits did not convert it to a bonus.

■ When Floyd made himself available to undertake employment as station manager, Segars became obligated to transfer 45% of Horizon Broadcasting's shares to Floyd at a stated time: the date the stations paid out. The whole of this 45% share in Horizon Broadcasting, representing both the risks and opportunities of the enterprise, was the inducement offered Floyd for the performance he continued to tender at the time of his discharge. Equity aims at rendering more complete and exact justice than that which is obtainable at law by rendering to a party the specific thing owed in its specific original form. It does not write for the parties contract which they never made. *See* Griffith, *Mississippi Chancery Practice* § 38 (2d ed. 1950); *Cf. Chapman v. Lott*, 144 Miss. 841, 110 So. 793, 794 (1927).

The district court was not clearly erroneous in finding that, until the day Segars breached the contract by discharging him, Floyd acted as station manager. Therefore, because the written contract gives no basis for allocating shares in proportion to Floyd's time employed but treats the shares as an indivisible package, we hold that the district court correctly adhered to the written contract in ordering the eventual transfer to Floyd of the remaining 25% of Horizon Broadcasting's shares in accordance with the contract.

■ Floyd also sued Segars for damages arising from the termination of his employment as Horizon Broadcasting manager. Significantly, Floyd did not sue Horizon Broadcasting for the loss of compensa-

tion. The district court correctly found that when Segars fired Floyd, he acted in his capacity as president and majority stockholder of Horizon Broadcasting, and thus incurred no personal liability for breach of the employment contract. No contract of employment ever existed between Segars individually and Floyd. Additionally, all matters surrounding Floyd's employment as general manager of Horizon Broadcasting rested entirely in parol. Even if Floyd had sued Horizon Broadcasting, the contract of employment, which was oral and extended for more than 15 months, would have been unenforceable because of the statute of frauds. Miss.Code Ann. § 15-3-1(d) (1972). Floyd does not contest the district court's finding that during the time period from Segars' breach of contract until the date of the filing of this law suit, he earned an amount greater than he would have earned as manager of Horizon Broadcasting. Therefore, we hold that the district court correctly denied all damages for loss of future income.

Segars contends that he should receive an accounting for the Funland operation and damages for alleged corporate defalcations by Floyd during his tenure as manager of Horizon Broadcasting. The district judge did not deal with these claims in his written Supplementary Opinion, but in issuing findings of fact and conclusions of law from the bench, he stated that he found these claims meritless. Segars treated these claims as matters of no moment until Floyd's discharge. The court found that "[t]here is no proof whatever that any of these discrepancies [allegedly in the business records] were traceable to Floyd, or that he had any participation in erroneous entries," and further found that prior to discharge, "Floyd did not fail to render faithful, honest, and efficient management service to Horizon Broadcasting." These findings by the district court have not been shown to be clearly erroneous. The court's conclusion that "these matters do not relate to the essence of the dispute, and they do not furnish any basis for termination of Floyd for cause," is due to be affirmed.

Because we find that all challenges to the district court's decision are without merit, the judgment of the district court is

AFFIRMED.